[Filed June 13, 1887.]

# LAURA LAKIN, RESPONDENT, *v.* OREGON PACIFIC RAILROAD COMPANY, APPELLANT.

RAILROAD COMPANY—RESPONSIBLE FOR ACTS OF ITS AGENTS, WHEN.—One Blackburn was employed by F., an employee of the defendant, to go upon an engine attached to a passenger train "to learn the road" to "Summit station with the regular engineer." At the Summit, B. was to take charge of the engine and then "receive his running orders." Before arriving at the Summit, the train being stopped, the engine was detached by one of the employees of the company, and without the regular engineer, the engine was taken to the Summit by B., accompanied by the brakeman of the engine and other servants of the company. In bringing the engine back, it ran into the train and caused the accident complained of. The company denied that F. had any authority to employ any one, and claimed that B. had no connection with the company. The plaintiff was a passenger on the train and was injured. *Held,* (1) That whether B. was legally employed or not, yet so long as he was acting in subordination to the agents of the company, and in the capacity of an employee, and the company through its regular agents acquiesced in it, the company was responsible for his acts while so employed. (2) That the contract of a railroad company is to safely carry people to their several destinations, and that to this end the company is liable for all the acts and omissions of its agents connected with, or in the line of their duty. That a distinction is to be made between the "scope of employment" of servants of the company, in its dealing with passengers, and the common-law rule as to the same subject in dealings with strangers. That the "scope of employment" of the servant of a railroad company in such cases is as broad as the contract with, and obligation to the passenger entered into and assumed by the company, and is not regulated by the *specified* duties of his employment. That if the engine was moved by employees of the company, though without the consent of the engineer, an instruction that "the company is liable for any damages that might arise from such moving, *whether within the scope of their employment or not,*" was not error, although it was inaccurate.

EVIDENCE.—A defect of a car or an engine cannot be shown in an action where the damage is alleged to have accrued through the negligence of employees, and the defects of the engine or machinery are not relied upon as a cause of action. But there is no error committed where a witness, detailing the circumstances of the accident, testifies that the engine was "leaking steam," the jury having been instructed by the court to disregard that part of his evidence. That the judgment would not be reversed because a witness in describing the accident testified to the mode of arrangement of the seats upon a car, where such evidence is merely incidental to his description.

CONTRIBUTORY NEGLIGENCE.—It is not contributory negligence on the part of the plaintiff where she—the cars being stopped for dinner—alighted from the train and subsequently resumed her place without direction so to do from the train men, and was then injured by a collision of the engine with the cars.

APPEAL from Benton County. Affirmed.

*L. Flinn, John Burnett,* and *J. R. Bryson,* for Appellant.

*Joshua J. Walton,* and *John Kelsay,* for Respondent.

THAYER, J.—This appeal is from a judgment of the Circuit Court for the county of Benton, recovered in an action in said court, brought by the respondent against the appellant on account of damages for personal injuries received while a passenger upon the appellant's line of railroad, en route from Yaquina City to Corvallis, in said county, alleged to have been occasioned through the appellant's negligence.   The case was tried in the Circuit Court by jury, and resulted in a verdict for the respondent for the sum of $1,650.   The grounds of the appeal are alleged errors in the rulings of the court made during the trial, and in the instructions given to the jury.   The following is the gravamen of the complaint: "That while the plaintiff was such passenger at or near the station called 'The Summit,' on the line of said railroad, a collision occurred by running the engine or locomotive of said railroad against the passenger cars while said passenger cars were detached from said engine or locomotive, and while the said passenger cars were standing on the track of said railroad, with such force that the said plaintiff was precipitated forward and thrown down on said cars, whereby the plaintiff was badly wounded, bruised, and injured about her person, and put in imminent danger of her life; and plaintiff was for a long time confined, and unable to attend to her usual business, and is yet, and has sustained permanent injury, and was obliged to, and did, pay large sums of money for doctoring and attendance, to wit, the sum of three hundred dollars; that the said collision was caused by the negligence of the defendant and its servants."   This was denied by the answer, and the following matter alleged therein: "That on the said thirty-first day of August, 1885, near the Summit station, on the railroad mentioned in the complaint, in Benton County, Oregon, the defendant was causing a train of cars to pass over said railroad from Yaquina City to Corvallis, Oregon, upon which train the plaintiff was a passenger, and that at said Summit station said train was halted and stopped for dinner, and that while said train was so stopped and halted to enable the passengers to get dinner at said Summit station, one C. E. Blackburn, who was at said time not in the service or employ of the defendant, wrongfully, and without the authority or con-

sent of the defendant, detached, and caused the locomotive to be detached and uncoupled from the passenger cars, and moved said locomotive along the track some distance from said passenger cars, and that in attempting to return said locomotive to its place and connect the same to the said passenger cars the collision mentioned in the complaint happened, and not otherwise; and that the same happened without the consent or knowledge of the defendant or its servants, or either of them, and that said Blackburn, at said time, was not in the employ of the defendant, and never had been, and that his act in uncoupling said train and separating said locomotive from the passenger cars, and in attempting to return the same to its place, and in causing said collision, was without the knowledge or consent of the defendant, and the same was wrongful on the part of said Blackburn." The answer also alleged that plaintiff contributed to the alleged injury by leaving the cars of defendant while they were stopped, and returning to them while the engine was detached, without the knowledge of the defendant or its servants, and carelessly and negligently entered said cars before she was notified or requested so to do, and before the alleged collision occurred, and by so doing contributed to said injury, and that said alleged injury would not have occurred but for the said carelessness and negligence of said respondent.

This reference to the pleadings shows pretty conclusively that the relevant testimony in the case was confined to narrow limits. The general facts evidently are not controverted. It may reasonably be inferred from the pleadings that the respondent was a passenger upon the appellant's train of cars as alleged in the complaint; that the train stopped near the Summit station upon the line of the road; that the locomotive was there detached, and run out on the line of the road to a point beyond the Summit towards Corvallis, was then run back to be coupled to the passenger cars again, and, in the act of effecting such purpose, produced a collision which resulted in the injury of the respondent. It is claimed upon the part of the appellant, as will be seen from the portion of its answer, to which reference has been made, that it was in nowise responsible for the collision men-

tioned, but that it was produced by the wrongful intermeddling of said C. E. Blackburn with the company's locomotive engine and train of cars.    The appellant denies any negligence in the affair, upon the grounds, I suppose, that the act was not its act, but the act of an interloper with whom the company had no relations whatever.    This, and the alleged negligence of the respondent, seem to be the main grounds of the defense to the action.    Both of the grounds were mainly matters of fact for the jury to determine.    If the injury was occasioned by the wrongful acts of a stranger, the railroad company ought not to be held responsible for it, unless the company in some way countenanced the acts so as to make them its own.    There was evidence in the case tending to show that said Blackburn was employed as engineer, and sent out on the train upon which the accident occurred by one Fordyce to learn the road between Yaquina City and the Summit.

Charles Meeker, the locomotive engineer on the train, testified that he got orders from the train dispatcher, Mr. Fordyce, to take Blackburn upon the engine "to learn him" the road between the two places; and Blackburn himself swore that he was sent out by Mr. Fordyce from Yaquina City as engineer at said time; that he supposed Mr. Fordyce to be acting as train dispatcher, or superintendent, or something of that kind, he did not know what; that at the time the instructions were given, Fordyce was at Yaquina City in the railroad office; that a great many persons were present at the time buying tickets; that Meeker was there.    The instructions were that Blackburn should get on the engine No. 2 with Meeker, the engineer, and proceed to the Summit; that upon arriving at the Summit he was to take charge of No. 2 engine, and work with it there until Meeker returned from Corvallis; Meeker was to take another engine run by a man by the name of Brown, and proceed to Corvallis; that when he, Blackburn, arrived at the Summit, he would receive his running orders; that after receiving from Fordyce the instructions he got on the engine with Meeker. He further testified, in substance, that after getting upon the engine they left Yaquina, and ran along with the train to Chitwood water-tank; that after leaving there, Meeker asked him to

take the engine and run it; that he took hold of the engine, and Meeker went back on the train among the passengers; that after running along to within two or three miles of Nashville, Meeker came back, and he, Blackburn, asked him to take the engine; the former said: "No, you are doing well, go ahead." Meeker finally resumed running the train, and after they got to the Summit there was some conversation about dinner between Meeker, the fireman, and some one; that Meeker got off the car and mingled with the people, and he, Blackburn, remained on the engine some time; a few minutes after, a man he thought was Mr. Rader came upon the engine, and a little later the brakeman also came to the engine; that one of these men went along the engine, pulled the pin (coupling-pin), and gave witness the signal to go ahead; witness asked him, "where to," and he said, "to get dinner"; witness asked him if it was "all right with Charley," referring to Meeker, and he said: "Yes, Charley said go along and get dinner." He then came in the engine and passed through the pilot-hole, and as he went out he put his foot against the throttle and opened it; that witness took charge of the engine and went across the Summit for dinner. After dinner the parties started back with the engine to where the train was. The other parties had got aboard before witness did, and the engine was moving back when he returned to it from dinner; that when he got on the engine the fireman had charge of it, and he said: "You take charge of it while I put in some wood." That witness did so, and shut off steam; that they were backing up the engine, and, as customary, witness turned his back to the throttle to observe his way back; that he saw before going a great ways that the tender brake was not sufficient to hold the engine; that when he shut the steam off, he dropped the lever down into the corner, and controlled the engine with the lever until he got within a short distance of the train; that at times, in going down grade, the fireman would work his brake a little, and that would give the engine a little start, and witness would fetch it up with the lever again; but at no time till near the train did he have occasion to throw the lever over across the center; that by bringing the lever up

beyond the center it would have a tendency to keep the engine
under control; when near the train, he saw the brakeman had
worked round the tender ready to make the coupling; that he
called out three cars, or four cars, he did not remember which;
the engine was then under control; just as he called "three
cars," or "four cars," witness was under the impression that the
brake was let off; that at any rate the engine "shot right back on
him"; that "any one who could handle an engine knows what
that means"; that witness did not have the spring down into the
notch; when the engine shot back on him it pulled him down
into the corner; that he turned the other way and attempted
to throw the lever over on the forward motion, and when he
threw the lever up towards the center the engine was moving
very fast; and when he brought the lever to the center he could
not throw it over, and then discovered, through the cylinder-
cocks, that "she" was leaking—could hear it sucking through
the cylinder-cocks.   This narration includes the circumstances
immediately preceding the collision.   There was a fireman, and,
I would infer from the bill of exceptions, two brakemen aboard
the engine at the time of the occurrence, though it is not certain
that there was more than one of the latter.

Mr. Wallis Nash, a vice-president of the road, was called as
a witness on the part of the appellant, and testified that the only
one who had power to employ persons was Henry V. Gates;
that the extent of Mr. Fordyce's authority was station agent at
Yaquina, and that he was acting under Gates' authority as tele-
graph operator in carrying Gates' orders to the train men; that
he had no other authority whatever over the men, except to exe-
cute Mr. Gates' orders.

Mr. Gates was also called as a witness for the appellant, and tes-
tified to the same effect, and further testified that Blackburn had
no authority to go out on the train at the time referred to.   The
witness testified upon his cross-examination that Fordyce was
the material agent; that as that agent he had charge of all sup-
plies on the road; that he was station agent, and had a station
agent's authority; outside of that he had no authority whatever;
had no authority to employ any person.

XV. Or.—15.

This in effect is all the evidence shown by the bill of exceptions as to Blackburn's connection with the affair, and his relation with the railroad company.

Upon the other ground of defense, the alleged contributory negligence upon the part of the respondent, the evidence contained in the bill of exceptions is very meager, and no statement is made in the bill of exceptions that there was evidence given upon that point that is not mentioned therein. Roy Rober, a witness on the part of the respondent, testified that he was upon the train at the time of the occurrence. In answer to a question as to what position on the car Mrs. Lakin was sitting at the time, he stated as follows: "I remember distinctly. She was sitting with her back partly to me, and sitting—the seats were with the backs together lengthwise in the cars—nearly to the end; perhaps eighteen inches, or perhaps two feet, from the end of the car. The benches stand that near to the end. She sat back from the end, I think at least four or five feet, with her back towards the bay from whence she came, her face towards the engine, and the child with its face towards the engine, and with its arms probably over the seat, and with its feet upon the seat, and in that position when it struck; because I noticed the engine when it struck, and she was thrown from there between the cars." The bill of exceptions contains the following: "The testimony in this case, in addition to that hereinbefore mentioned, tended to show that when the train stopped for dinner at the Summit, that a portion of the passengers remained on the cars to eat lunch; that Mrs. Lakin so remained on the cars; that soon after the cars stopped she went off to take her little girl to a water-closet, and she was off about five minutes, and then she returned, and was eating her lunch when the accident occurred." The other evidence in the case showed that when the engine struck against the cars it was moving very fast, and that the concussion was severe. I do not see anything in the bill of exceptions that would have warranted the jury in finding that the respondent was guilty of contributory negligence in the affair. It does not even hint at any act or omission upon her part that concurred in producing the injury complained of. She paid her fare to

the said company, and took passage upon said train of cars, and was careful and prudent in her conduct, so far as anything to the contrary is shown. Nothing, therefore, can be claimed from that ground of defense.

As to the former ground, the injury being the result of the wrongful act of Blackburn and not from any negligence of the company, very little more can be claimed than from the latter. The evidence referred to tends to show that Blackburn was requested by Mr. Fordyce, the station agent of the company at Yaquina, to go aboard of the train and learn the route preparatory to his taking charge of the engine and operating it as engineer; that he did so; went in company with Meeker, the regular engineer, who was directed by said agent to teach him the road; that he was aboard the engine when it was detached from the train; went with it to where the employees of the railroad company took dinner, and returned upon it; that when it started back he was requested by the fireman to take charge of it, which he did, and in connection with the fireman and brakeman endeavored to manage the engine as it was backed down towards the train in order to be coupled onto it. It is conceded on the part of the appellant that Fordyce was in its employ, but it was claimed that the only one who had power to employ persons was Henry V. Gates; that the extent of Fordyce's authority was that of station agent at Yaquina, and he was also acting, under Gates' authority, as telegraph operator in carrying Gates' orders to the train men; that he had no authority whatever over the men except to execute Mr. Gates' orders. Granting that this was as claimed, and that Mr. Gates had not empowered Mr. Fordyce to employ Blackburn, or to direct Meeker to take him upon said train at the time mentioned, and yet I fail to see how that is to relieve the company from liability. Blackburn was aboard the engine, serving the company at the request and with the acquiescence of its servants and agents; and if the accident occurred through his special neglect or want of skill in the management of the engine, which does not appear at all, the company would be just as liable. Every employee of a railroad company is, to a limited extent, its agent; and what difference

can it make whether the negligence which occasioned the injury resulted from the negligence or wrong of Blackburn, as *de jure* engineer, or from the negligence or wrong of Fordyce in placing him in the position of engineer? The latter was a regular employee of the company, and deputed to execute the orders of Gates. Blackburn evidently had no reason to believe but that Fordyce had been empowered to employ him, and his going aboard of the engine, and doing what the testimony tended to show he did do, was no intrusion. No one will pretend that it showed him to have been a trespasser in acting the part he did. Whether he was legally employed or not, so long as he acted in subordination to the agents of the company, the liability of the latter to the respondent was not affected. Its obligation to her was to carry her safely and properly; the mode of performance of its duty was through the means of agents and servants; and if it failed to fulfill its obligations in consequence of their wrong, it became responsible for the injury that was thereby occasioned. How is the public to know whether an engineer aboard a train of cars has been legally employed or not? or what difference does it make so long as he is there, acting in such capacity, and the company, through its regular agents and managers, acquiesces in it? The conductor is supposed to have been there, and he is said, by a great many authorities, to be *pro hac vice* the company. He must have countenanced all that Blackburn did up to the time of the collision. If the latter had forcibly taken possession of the engine and occasioned the collision, and the agents and employees of the company been unable to prevent it, the latter would not have been liable for the consequences. But no such an affair as that is shown by the facts, and we must conclude that the merits of the case are with the respondent, unless error crept into it through the admission of testimony, the rulings at the trial, or in the charge of the court to the jury.

The appellant has assigned numerous grounds of error. As classified under general heads, they consist in permitting the respondent, when on the stand as a witness, to describe the condition of the cars upon which the passengers were transported, and the manner in which she was injured; in admitting the tes-

timony of Blackburn as to the boiler leaking steam; and in returning the answer made to the inquiry of the jury, that "if the locomotive was moved by the servants or agents of the company, whether within the scope of their employment or not, the company is responsible for all their acts." The appellant's counsel claim that the evidence in regard to the condition of the cars, and of the boiler leaking steam, was objectionable, on the grounds that it tended to prove negligence on the part of the company in failing to provide suitable means of conveyance of passengers, and safe appliances and machinery, when those matters had not been counted on in the complaint. The allegation in the complaint is that the collision occurred by running the locomotive against the passenger car; "that said collision was caused by the negligence of the defendant and its servants." It is perhaps questionable whether the respondent had, under that allegation, the right to prove at the trial the unsuitability of the cars used by the appellant to transport passengers, or the defectiveness of the engine or boiler in the particular referred to, as a ground for a recovery in the action. It might reasonably be claimed that, by a fair construction of the complaint, the negligence alleged therein referred to some act or omission of the appellant's servants in the management of the engine at the time it was backed down to the passenger cars to be coupled to the train; but there certainly could have been no error in the respondent describing how the cars were constructed, in order to show the particular manner in which she had received the injury. I cannot see any objection to that, nor how the fact that the passengers were in an open car, with the seats arranged in a particular way, could have prejudiced the appellant with the jury, as its counsel seem to think it did. The respondent knew how the car was arranged when she went into it, and probably long before; and if she thought it was not such a one as the appellant ought to furnish, she would have objected to riding in it. Its defects were visible, if it had defects, and she took the risk incident thereto. The evidence in regard to "the steam escaping" came in incidentally in the testimony of Blackburn, as a part of his narrative of the affair; neither of these

matters were sought to be made a ground of negligence, and the court instructed the jury. especially not to consider the latter as such. I do not see how anything more could reasonably be claimed, and am satisfied that no error is shown from those matters.

The inquiry of the jury, to which the answer before referred to was given by the court, was whether, "in case the jury find that the employees of the company, that is, the fireman and brakeman, moved, or permitted the engine to be moved, without the consent of the engineer, the company was liable for any damages that might arise from such moving." The answer that the company, under the circumstances, was responsible for all their acts was correct. The court, however, to make it stronger, probably included in the answer the words, "whether within the scope of their employment or not." That left the inference that the fireman and brakeman might not have been acting within the scope of their employment, if they moved, or permitted the engine to be moved, without the consent of the engineer. If it were possible that the acts of the fireman and brakeman in the matter referred to could have been without the scope of their employment as it related to the respondent, the instruction would have been erroneous; and it was inaccurate as given under any view. The court, however, was entirely excusable in committing the inaccuracy, as there has been a contrariety of decisions upon the point that are calculated to confuse any one. But for a fireman, brakeman, or any other of the employees of a railroad company, having charge and management of a train of cars employed in transporting passengers from and to given places, to get out of the scope of their employment concerning such passengers, would be to get out of the employment of the company by dissolving their relations to it as servants. The error in attempting to excuse common carriers from liability on account of an injury resulting to a passenger has arisen from a misapplication of the old principle that the master is not liable for the malicious acts of his servant. When a servant goes outside of his employment, and wantonly inflicts an injury upon a third party to whom the master owes no duty, it may well be said that the servant was a principal in the affair; that

he was acting for himself in that matter, and was not a servant. But where the master obligates himself to transport a person from one place to another safely and properly, and to protect him from injury from any source that human judgment and foresight are capable of providing against, and the master intrusts the performance of the duty he has so undertaken to discharge to his employees, he becomes responsible for their acts, whether negligent or malicious, and they continue in the line of their employment until their relation with the master is absolved. The specified duty of an employee in such a case may be very limited, but the scope of the employment is as broad as the obligations the master has assumed. The distinction here indicated, as to when the master is liable for the acts of his servant, has often been overlooked by both counsel and courts. The counsel in this case has cited a number of authorities, apparently without having observed it.

In *Jewell* v. *Grand Trunk Ry. Co.* 55 N. H. 84, the first case they cite, the defendant was under no obligations to the plaintiff; there, the plaintiff went to the defendant's depot to get certain freight, consisting in part of a crate of crockery; it was pointed out to him by Monneghan, the defendant's employee. Two men were at work for Monneghan in the company freight-house; assisted the plaintiff to load the freight, except the crate of crockery, upon his wagon. When it came to loading the crate of crockery, one of the men called upon Monneghan to assist in putting it upon the wagon. He did so, and, in loading it, injured the plaintiff in consequence of the crate striking against his shoulder, and for which the action was brought against the company. *Held*, that if the consignee of goods accepts a delivery at a place or in a manner different from what a common carrier is liable by law to deliver them, the business of removing them becomes from that time his business, and the carrier cannot be held liable for the acts or omissions of those employed to do the work. It was upon that principle that the new trial was granted in the case, the trial court having refused an instruction prayed by the defendant's counsel covering it. The gist of the decision is that pointing out the freight to the plaintiff in the freight-house,

and his accepting it there, ended the defendant's obligation to the consignee, and what Monneghan and the other persons did in loading it upon the plaintiff's wagon was beyond the scope of their employment, simply because it was an act the company had not contracted to do. Its service was completed when the freight was delivered, either in the freight-house or elsewhere, and when its employee undertook to do something beyond that, he got outside of the course of his employment.

In the case of *Little M. R. R. Co.* v. *Wetmore,* 19 Ohio St. 110, cited by appellant's counsel, the distinction in question was only referred to. The court said, at page 133 of the case, that, "in order to withdraw this case from the operation of the general rule, and hold the company responsible on the ground of its contract with the plaintiff as a passenger, it is necessary to maintain that the company, in requiring the plaintiff to apply to its servant for the purpose, and as the only means of getting his baggage checked, impliedly undertook to vouch for and warrant the good conduct of the servant towards the plaintiff while the two were engaged in transacting the business. Whether this position is tenable, we do not find it necessary in the decision of the case now before us to express a definite opinion. The case was not tried on this theory in the court below, nor has this phase of the question been argued here. But if such rule of liability could be applied against the company, it would necessarily impose the reciprocal duty upon the plaintiff to so demean himself towards the servant as not, by misbehavior, to provoke a personal quarrel between them." The court concluded that "the evidence of the company on the trial tended strongly to prove that the plaintiff, by his importunate conduct and abusive language towards the servant, provoked a personal quarrel between them; that the assault was the result of this quarrel, and that the blow was inflicted by the servant as an act of personal resentment." And that "if these facts had been found by the jury, the wrongful act of the servant in striking the plaintiff could not be regarded as authorized by the master, nor as an act done by the servant in the execution of the services for which he was engaged by the master."

*Isaac* v. *Third Avenue R. R.* 12 Daly, 340, another case cited, seems to be in line with that of *Little M. R. R.* v. *Wetmore*, though I believe the distinction alluded to was there entirely overlooked, although the defendant in the case was under an obligation to the plaintiff, she being a passenger upon the street railroad car, and its servant, the conductor thereof, having thrown her from the car with great violence out upon the pavement, whereby she was seriously injured. The other authorities cited by said counsel are cases where the master owed no special duty to the party injured by the servant's act. The decisions in the Ohio and New York cases above referred to would have been entirely sound, no doubt, if the obligation the defendant in each of the cases was under to the plaintiff therein, before suggested, had not existed. But in view of such obligations I am unable to discover how a common carrier of passengers is exempted from liability for the misusage occasioned by the parties designated by the carrier to perform the latter's duty in transporting such passengers, whether it result from the malice and violence, or ordinary negligence, of such parties.

I indorse fully the language of Chief Justice Ryan in *Craker* v. *Chicago & N. W. R. R. Co.* 36 Wis. 669, where, after referring to the liability of principals for wilful and malicious acts of agents, he says: "But we need not pursue the subject, for, however that may be in general, there can be no doubt of it in those employments in which the agent performs a duty of the principal to third persons as between such third persons and the principal. Because the principal is responsible for the duty, and if he delegate it to an agent, and the agent fail to perform it, it is immaterial whether the failure be accidental or wilful, in the negligence or in the malice of the agent; the contract of the principal is equally broken in the negligent disregard or in the malicious violation of the duty by the agent. It would be cheap and superficial morality to allow one owing a duty to another to commit the performance of his duty to a third person without responsibility for the malicious conduct of the substitute in performance of the duty. If one owe bread to another, and he appoint an agent to furnish it, and the agent, of malice, furnish

a stone instead, the principal is responsible for the stone and its consequences. In such cases, malice is negligence. Courts are generally inclining to this view, and this court long since affirmed it."

The same doctrine is maintained in *Goddard* v. *Grand Trunk Ry. Co.* 57 Me. 202, and is there supported by citations to a large number of authorities; and this court, in *Sullivan* v. *Oregon Railway & Nav. Co.* 12 Or. 405, indorsed it. The fireman and brakeman, if they moved the engine, or permitted it to be moved, without the consent of the engineer, were still within the scope of their employment. At least the company was responsible for any consequences attending the affair, occasioned by their negligence or that of any person permitted to be on the engine assisting in its management; and therefore the remark of the judge, "whether within the scope of their employment or not," could have done no injury.

As to whether there was negligence or not in detaching the engine from the train, running it over the Summit, and backing it down to the train in the manner shown by the testimony given at the trial, was a question for the jury. Under the facts shown, I think the jury were authorized in finding negligence, and that the judgment appealed from should be affirmed.

Having been of counsel, STRAHAN, J., took no part in the hearing or deliberations in this case.

On petition for rehearing.

THAYER, J.—I have examined the petition for a rehearing filed herein, and am unable to discover therefrom any good reason for changing the former opinion expressed in this case. The petition, in fact, is but an extended argument upon the questions already considered, and I would deem it unnecessary to indicate any further view, were it not for certain language which appears in the petition, of which the following is a copy: "If the principles are to be applied to the extent indicated in the opinion, they carry the law of agency to the extent not heretofore enforced or declared in any case within our knowledge, and which, as it

seems to us, must tend to a very great extent to render the trans-
actions of business by means of agents impracticable, for the
reason that under the doctrine of this case the master or princi-
pal is rendered powerless, he is at the mercy of his employees,
who may, as *his agent,* but without his authority, or knowledge,
or consent, by leaving the line of their employment, do wrongful
acts enough to bring bankruptcy and ruin to the master or
principal."

I supposed the position of the court would be understood, from
what has been already announced as its views upon that question;
but counsel seem to overlook the principle upon which the opin-
ion was based. It is simply this: A common carrier of pas-
sengers undertakes to transport them safely and with reasonable
dispatch. That is an obligation the common carrier takes upon
himself, or itself, when he or it engages to carry passengers *for
hire.* If that obligation is broken, the carrier is liable, whether
the breach results from the negligence, misconduct, or malice of
the persons the carrier employs to perform the obligation.

The question whether the agent kept within the line of his
duty, or got out of it, is unimportant. A conductor, brakeman,
or other employee upon a passenger train of cars, is employed to
perform certain duties; but whether he keep within the line of
his duty or not has nothing to do with the company's liability
to a passenger, if injured through the fault of such employee.

A railroad engineer would have no right to get drunk, or act
recklessly or maliciously while running a train of cars. If he
did so, he might be said, in one sense, to be outside of his line
of duty; but who would undertake to exonerate the company
from liability for an injury to a passenger occasioned by any
such acts? A person who takes passage upon a train of cars
contracts with the company that he shall receive good treatment
while in transit. Under such circumstances, could it reasonably
be contended that the company would not be liable, if its agents
or servants were wantonly to inflict abuse upon such passenger?
No court would stop to inquire whether the agent or employee
was outside of his line of duty or not; it would make no differ-
ence whether he acted from honest motives or maliciously; the

effect would be the same.   The obligation of the company would
be violated, and its liability attach.   So with the obligation to
transport passengers safely.   It may be violated as well by the
malicious acts as the negligent acts of its employees, and the ques-
tion of their being within or beyond their line of duty in such
cases cannot be considered.

The rule is different, of course, where the act of the agent
affects a party to whom the company owes no duty.   There the
character of the act, as to its being negligent or malicious, becomes
important.   That a master is not ordinarily liable for the mali-
cious acts of his servant is an old and well-settled principle, and
the reason of the rule is that the servant becomes a principal when
he commits such acts; he is then outside of his line of duty.
But in a case like the one under consideration, the master cannot
shield himself from liability upon any such grounds.   The liabil-
ity there arises out of another principle, which was attempted to
be explained in the opinion delivered.

The exception to the proof as to the kind of car the respond-
ent was in when the collision occurred between the cars and
engine is insisted upon as error with more pertinacity than con-
sideration.   The point is merely technical at most.   If the posi-
tion of the appellant's counsel were correct, they have very little
to complain about.   They were certainly not taken by surprise
in the proof; it was not a matter that could be sprung upon
them and they not prepared to meet.   The proof related to an
open, visible, notorious fact, which they were as well prepared
to disprove, no doubt, at one time as another.   How could it
have been important to apprise the appellant that the respond-
ent would prove the style and arrangement of the car.   The
former knew that it was an open car, that the seats were arranged
lengthwise, and that the ends were entirely open; or if that were
not the fact, they could have disproved it by its employees who
had control of the car, and by hundreds of others upon very short
notice.   The fact was of such a character that the appellant could
not have been misled in consequence of the proof.   The counsel
for the appellant seem to think that it was entitled to all the
immunity of a prisoner under indictment.   The claim that this

proof tended to establish another and different ground of liability, to my mind, is wholly absurd.    Proving the mode in which the car was constructed established no liability.    The appellant had a legal right to run cars of that character upon its road, and the respondent took all the risk incident thereto when she engaged passage upon them.    It is not like a case where cars are defective and occasion a casualty in consequence thereof; they were perfect as designed.    If the respondent had engaged passage in a closed car, an ordinary passenger coach, and the company had placed her in an open flat car, there might have been grounds for liability in case of accident.    Using such kind of car under the circumstances this one was employed did not, however, create any liability, and the fact as to its mode of construction and arrangement was only important as an effect, and not as a cause. Its proof was competent in order to show how the injury was received, and to disprove the charge of contributory negligence, and it evidently was admitted upon that ground.

There are no sufficient grounds for a rehearing, and the motion will therefore be denied.