Argued and submitted March 2, decisions of the Court of Appeals and trial court affirmed June 7, 1988

G. L.,
*Petitioner on Review,*

*v.*

KAISER FOUNDATION HOSPITALS, INC.,
*Respondent on Review.*

(CC A8309-05835; CA A40470; SC S34799)

757 P2d 1347

Raymond J. Conboy, of Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, argued the cause and filed the petition for petitioner on review.

John R. Faust, Jr., of Schwabe, Williamson & Wyatt, argued the cause for respondent on review and filed a response to the petition.

JONES, J.

## JONES, J.

Plaintiff, admitted to Kaiser Foundation's Sunnyside Hospital for surgery to control duodenal bleeding, was confined after surgery for a time in the intensive care unit, followed by a transfer to the progressive care unit. Finally, on April 29, 1983, plaintiff was transferred to a semi-private room in the hospital, shared by an elderly, partially paralyzed patient.

In the early morning hours of May 1, 1983, plaintiff was sexually assaulted by Terry Daniel, a respiratory therapist employed by defendant. She was unconscious at the time of the assault, possibly as a result of being drugged by Daniel. The other patient in plaintiff's room reported the assault to plaintiff and to hospital personnel. Daniel later pleaded guilty to attempted rape in the second degree.

Plaintiff brought this action against defendant for her injuries, based on several theories of liability. At the direction of the trial court, plaintiff prepared a pretrial order setting forth all her allegations and theories of defendant's liability. The trial court granted defendant's motions for dismissal and summary judgment as to plaintiff's strict liability claims against the hospital and submitted plaintiff's "negligent retention" and negligent supervision claims to a jury, which found in favor of defendant. Plaintiff appealed the dismissal of her allegations of strict liability to the Court of Appeals, which affirmed the decision of the trial court. *G.L. v. Kaiser Foundation Hospitals, Inc.,* 88 Or App 528, 746 P2d 731 (1987). We affirm the decision of the Court of Appeals.

Plaintiff based her allegations of liability beyond negligence on two theories:

"[1.   *Strict Liability:*] Public policy regulates that Defendant hospital be held strictly liable for injuries caused to Plaintiff by the Defendant hospital's employee Terry Earl Daniel.

"[2.   *Implied Contract:*] By admitting Plaintiff as a patient, Defendant Kaiser Sunnyside Hospital contracted to provide adequate care, safety, treatment, and security for Plaintiff while she was an inpatient. The sexual assault committed by Terry Earl Daniel breached the Defendant's contract with Plaintiff in that Defendant hospital did not provide adequate care, treatment, safety and security for Plaintiff."

Both theories are similar in that they seek to impose liability on the hospital[1] for the actions of others beyond the control of the hospital, but they differ in that one would base liability on the relationship between the hospital and the perpetrator of the offense, while the other concentrates on the relationship between the hospital and the patient.

Defendant moved to strike these allegations. The circuit court granted the motion. It is this decision by the trial court that is before us. Plaintiff does not appeal from the jury verdict for defendant on the negligence theories.

The question before this court is a matter of first impression in Oregon, if not in the nation. The question is whether a hospital is liable for injuries caused by the criminal assault of an employee on a patient when neither the hospital as a decision-making entity nor any of its employees was negligent and where the attacking employee was acting outside the scope of employment.

### 1. *Plaintiff's Strict Liability Claim.*

The idea that an employer must be responsible for certain acts of employees is well established and is not questioned by either party in the present dispute. This case concerns the boundaries of the doctrine of *respondeat superior:* Under what circumstances will an employer be liable for the intentional torts of the employee? To answer this question we must turn to the rationale upon which the doctrine of *respondeat superior* rests.

*Respondeat superior* is a form of strict liability that imposes liability on a defendant without regard for the defendant's fault. This imputation of liability, also referred to as "vicarious liability," is based on long-established policy reasons; *i.e.,* an employer who receives the social and economic benefits of employing others must also be responsible for the acts of employees who are only acting in this fashion because of their employment. *Stanfield v. Laccoarce,* 284 Or 651, 655, 588 P2d 1271 (1978); *Gossett v. Simonson,* 243 Or 16, 22, 411 P2d 277 (1966).

Plaintiff wishes to extend the traditional role of

---

[1] When we use the term "hospital," we refer to Kaiser Foundation Hospitals, Inc.

vicarious liability to new limits. In her pretrial order, plaintiff proposed a new public policy rationale for hospital liability. She alleged that "Public Policy regulates that Defendant hospital be held strictly liable for injuries caused to Plaintiff by the Defendant hospital's employee." In her brief before the Court of Appeals, plaintiff elaborated on this argument:

> "The issue presented by this appeal is simple. Should the patient or the hospital bear the loss from rape or other criminal conduct committed by a hospital employee whose employment by, and duties about, the hospital facilitate the commission of a crime. Assuming, as generally is the fact, that the criminal is financially irresponsible, is it more reasonable for the hospital who has employed the wrongdoer or the patient who has been victimized by him to shoulder the financial burden of criminal conduct."

In this argument plaintiff is repeating a common theme in the doctrine of *respondeat superior*. "What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk." Keeton, Prosser and Keeton on Torts 500, § 69 (5th ed 1984).

The particular character of the "policy" argument in this case calls upon us to turn again to the question of this court's analysis of policy arguments. In *Donaca v. Curry Co.*, 303 Or 30, 36, 734 P2d 1339 (1987), we stated that this court has not "embraced freewheeling judicial 'policy declarations' in other cases." Such a statement is not a denial of the undeniable fact that the precedential effect of cases decided by an appellate court means that decisions have an effect on policy. Neither is this statement a prohibition on changes in the common law by court decision. *See Dahl v. BMW*, 304 Or 558, 567, 748 P2d 77 (1988). The limitation noted in *Donaca* represents a limitation on the rationales that this court will consider when it is being asked to make a decision with precedential value. Most specifically, when we refused to limit the potential liability of Curry County in all cases involving the trimming of roadside brush on the "policy" ground that such potential liability would impose additional costs on the scarce resources of the county, this court was continuing to refuse to create potential liability or immunity as a matter of law based on certain types of "policy" arguments. In *Donaca* and in the cases cited therein this court has refused to change the common law of this state based on arguments concerning the

general economic resources of the plaintiff or defendant. We similarly reject plaintiff's invitation to write new policy for hospital liability based on economic grounds in this case.

Plaintiff relies on *Hungerford v. Portland Sanitarium,* 235 Or 412, 384 P2d 1009 (1963). That was an exceptional case in that this court overruled an eight-year-old case which conferred upon charitable enterprises immunity from liability for the torts of their servants. The court recognized the obsolescence of charitable immunity, citing treatises that pre-dated the prior decision, and concluded that expediency no longer justified adherence to a dying doctrine. *Id.* at 414. The court found no reason for adherence to the immunity rule for charities. *Id.* at 416.

■ Ordinarily this court reconsiders a nonstatutory rule or doctrine upon one of three premises: (1) that an earlier case was inadequately considered or wrong when it was decided, *see, e.g., Winn v. Gilroy,* 296 Or 718, 681 P2d 776 (1984) (reconsidering parental immunity); (2) that surrounding statutory law or regulations have altered some essential legal element assumed in the earlier case, *see, e.g., Dahl v. BMW, supra,* 304 Or at 567 (enactment of comparative fault statutes supports re-examination of prior case holding that failure to wear a safety belt is not a proper defense); *Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or 543, 562-67, 652 P2d 318 (1982) (wrongful death law did not alter liability to child if parent survives injury); or (3) that the earlier rule was grounded in and tailored to specific factual conditions, and that some essential factual assumptions of the rule have changed. Without some such premise, the court has no grounds to reverse a well-established rule besides judicial fashion or personal policy preference, which are not sufficient grounds for such a change, *see Norwest,* 293 Or at 553.

■ In the present case, defendant's liability depends on the application of existing policy underlying *respondeat superior* to the facts of this case. When the principles of *respondeat superior* were in their infancy, courts emphasized the idea that the master was liable for the servant's actions because the master exercised control over the servant as a part of the employment relationship. Following these notions, courts "refused to hold [the master] liable for intentional or 'willful' wrongdoing on the part of the servant, on the ground that it

could not be implied that such conduct was ever authorized." Keeton, *supra* at 504-05, § 70. When the emphasis changed to liability based on an allocation of assumed risk, so that employers were held liable for actions if taken within the scope of employment, the barrier between intentional acts and employer liability also changed. *See id.*; Note, *Respondeat Superior and the Intentional Tort: A Short Discourse on How to Make Assault and Battery a Part of the Job,* 45 U Cin L Rev 235 (1976).

There are numerous cases across the nation which have found that an employer is liable for the intentional torts of an employee. The easiest cases are those where the employee is authorized by the employer to use force but exceeds the amount of force authorized. *See, e.g., Newkirk v. Oregon-Wash. R.R. & Nav. Co.,* 128 Or 28, 273 P 707 (1929) (railroad brakeman); *Stewart v. Napuche,* 334 Mich 76, 53 NE2d 676 (1952) (bouncer). The Restatement (Second) of Agency 537, § 245 (1957), recognizes that employer liability may extend beyond these easy cases:

> "A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpected in view of the duties of the servant."

The most common limitation on employer liability is that the intentional act must have been undertaken with the intent of furthering the business purposes of the employer, however misguided that intent might seem. *See, e.g., King v. Magaw,* 104 Ohio App 469, 150 NE2d 91 (1957); *Limpus v. London General Omnibus Co.,* 158 Eng Rep 993 (Ex 1862).

Recently this court held that a plaintiff can state a colorable claim against an employer for the tort of an employee if three requirements are met. In *Chesterman v. Barmon,* 305 Or 439, 442, 305 P2d 439 (1988), we stated:

> "Three requirements must be met to conclude that an employee was acting within the scope of employment. These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the

employer; and (3) whether the act is of a kind which the employee was hired to perform." (Citations omitted.)

This court also distinguished acts which might lead to a valid *respondeat superior* claim from other acts which did not create potential liability because they were not related to employment. *Chesterman v. Barmon, supra.* Where, as here, there is no allegation — and we cannot imagine one — that the employee was acting for the purpose of furthering any interest of the employer, plaintiff has failed to state a claim for tort liability and dismissal of plaintiff's claims beyond theories of negligence was proper.

## 2. *Plaintiff's Implied Contract Claim.*

Plaintiff also alleged that defendant hospital should be liable for the harm suffered by plaintiff because the hospital contracted to protect plaintiff as a patient. Plaintiff asserts that a claim for breach of contract can exist when the contract establishes a special relationship between the contracting parties such that a legally recognizable obligation of care has been created.

Plaintiff does not allege an actual contract of safekeeping between herself and the hospital. She argues that there is a contract implied in fact by the hospital's holding itself out as a place of secure care-giving, or one implied as a matter of law by the analogy of the hospital as an innkeeper. Plaintiff did not allege any facts showing statements by the hospital which led her to rely on the hospital as a place of special safekeeping care. Thus, plaintiff's claim of liability in this regard comes down to a question whether the hospital can be held as a matter of law to have implied an offer to all its patients that the hospital is a place of safekeeping from the criminal acts of others.

To imply such a promise as a matter of law invents a legal fiction in order to create a foundation of "duty" for an action for physical injuries. If a hospital is to be strictly liable to its patients for intentional misconduct of its employees acting outside the scope of their employment, such a duty would not long be confined to those patients with whom the hospital has a contractual relationship; the relationship and the duty properly would extend to all patients, including patients who are brought unconscious to the emergency room

or otherwise have no contract made for them or capacity to contract for themselves.

Plaintiff argues that the law should impose the same liability on a hospital as it does on innkeepers or common carriers. The analogy might be persuasive if their liability were as strict as plaintiff believes, but we find that it is not. A careful analysis of the law in this area indicates that plaintiff's characterizations of the law do not correspond with the law in Oregon, nor do they correspond to innkeeper liability in the contemporary world. The idea that the common law held innkeepers obligated for the safekeeping of their guests seems to be derived from two sources: the duty of innkeepers to protect their guest's property, and an analogy made between innkeepers and common carriers.

In *McIntosh v. Schops,* 92 Or 307, 180 P 593 (1919), and again in *Lyons v. Kamhoot,* 281 Or 615, 575 P2d 1389 (1978), this court mentioned the common-law theory which holds innkeepers strictly liable as bailees of property. In *Real Good Food v. First National Bank,* 276 Or 1057, 557 P2d 654 (1976), this court included innkeepers among a list of analogous bailees who cannot contract away their implied obligation of reasonable care of a patron's goods. But these cases deal with the care of bailed personal property, not persons, who, unlike property, are not "bailed." For that reason alone they do not offer any inducement for this court to extend liability to include the defendant in this case.

The idea that the common law imposed an implied contract responsibility on innkeepers is not as clear to this court as it is to some. We recognize that some early courts have imposed an implied contractual obligation on innkeepers for the intentional acts of employees and third persons. For example, in *Clancy v. Baker,* 71 Neb 83, 98 NW 440 (1904), the court made the defendant owners of a hotel liable for the injuries caused by a porter's shooting a child. The court first decided that innkeepers have an implied contract with their guests to keep them safe. Then, using reasoning similar to that of the typical *respondeat superior* case, the court extended the innkeeper's liability to acts of the innkeeper's employees who have been delegated the duty of safekeeping.

Whatever the validity of this decision by itself, it was soon gathered together with a few other cases and cited as

authority to illustrate the "correct" view of the common law. *See* Beale, The Law of Innkeepers and Hotels § 172 (1906). This view has been repeated since that time without much additional analysis. *See, e.g.,* Sherry, The Laws of Innkeepers (1972). In our view the Nebraska court was making law rather than following law. The Nebraska court decided that there was an analogy between innkeepers and common carriers by citing common carrier cases and then concluding that the reasoning applied "with equal force to a hotel keeper." *Clancy v. Baker, supra,* 98 NW at 442. This was not a universally accepted conclusion at the time. In deciding a very similar case the same year, the Supreme Court of California rejected the view of the Nebraska court:

> "[T]here is no ground upon which this judgment can be sustained unless we are prepared to hold that, to the same extent that a common carrier is an insurer of his passengers, an innkeeper is an insurer of his guests against the torts of his servants. We cannot discover any safe ground for such a conclusion. No statute of California imposes such a rule, and no evidence is to be found in the reports of decided cases that such was the rule at common law. Indeed, it was said in Calye's Case, decided in the King's Bench in 26 Elizabeth (Coke, pt. 8, *63), that, 'if the guest be beaten in the inn, the innkeeper shall not answer for it'; he being liable, as such, only for damages to the guest's goods and chattels. Since that time no other rule seems to have existed in England or in this country * * *." *Rahmel v. Lehndorff,* 142 Cal 681, 76 P 659, 661 (1904).

The California court examined the one case also cited in *Clancy v. Baker* which had suggested that innkeepers should be liable, *Rommel v. Schambacher,* 120 Pa 579, 11 A 779 (1887). In addition to suggesting that the case actually involved negligent acts on the part of the tavern owner, rather than strict liability for safekeeping, the California court noted that the analogy that the Pennsylvania court had made with common carriers was unsupported:

> "To sustain this conclusion but one case was cited in the opinion of the court, and that a case of carrier and passenger. So that in fact there was a complete begging of the question presented here, viz., whether there is a rule as to protection of guests of an innkeeper equally stringent with the rule affecting common carriers. The fact that no case was then cited or can now be found in which an English or American court has

sustained the conclusion stated * * * warrants more than a doubt of the correctness of that conclusion." *Rahmel v. Lehndorff, supra,* 76 P at 660.

Beale, in his dissertation, cites *Curran v. Olson,* 88 Minn 307, 92 NW 1124 (1903), as authority that an innkeeper "owes an affirmative duty to protect [a guest] from assault" and "the servant, in assaulting the guest, is committing the tort for himself; but he is breaking the obligation of protection which rests on the innkeeper." Beale, *supra* at 119, § 172. The citation by Beale is misleading because it comes within Beale's argument that there is an absolute duty of safekeeping, which the *Curran* court did not hold. The court simply held that the defendants, who were the owners of a saloon, were "bound to use reasonable care to protect their guests and patrons from injury * * *. If they delegated this duty to their barkeeper, they are responsible for his negligence in the premises." 92 NW at 1124. Further, *Curran* was a case against a tavern keeper, not an innkeeper. Innkeepers contract to provide room and sometimes board for guests. Tavern keepers traditionally provide liquor and sometimes food to patrons. The relationships are not the same. In any event, *Curran* does not support Beale's contention that innkeepers impliedly contract for the safekeeping of guests.

Whatever the standard may have been in earlier times, we believe that the reasons given for innkeeper liability based on a contract of safekeeping are not appropriate for today. A better evaluation of changing times is reflected in the following:

> " 'This rigorous rule had its origin in the feudal conditions which were the outgrowth of the Middle Ages. In those days there was little safety outside of castles and fortified towns for the wayfaring traveler, who, exposed on his journey to the depredations of bandits and brigands, had little protection when he sought at night temporary refuge at the wayside inns, established and conducted for his entertainment and convenience. Exposed as he was to robbery and violence, he was compelled to repose confidence, when stopping on his pilgrimages over night, in landlords who were not exempt from temptation; and hence there grew up the salutary principles that a host owed to his guest the duty, not only of hospitality, but also of protection.'

*Crapo v. Rockwell,* 48 Misc. Rep. 1, 94 N.Y. Supp. 1122 (1905).

"Although castles and fortified towns are no longer part of our landscape, bandits and brigands remain. The common law has responded to these cultural changes by lessening, but not removing, the innkeepers' liability for criminal acts committed by third parties. * * *" *Kveragas v. Scottish Inns, Inc.,* 733 F2d 409, 412 (6th Cir 1984).

Thus, even if patients in hospitals may be analogized to guests in an inn, we reject the theory that either innkeepers or hospitals have "contracted" for the safekeeping of the people who stay in these temporary abodes.

As mentioned, plaintiff also argues that the law should equate a patient in a hospital with a traveler on a common carrier. Plaintiff relies on comments made by Justice Thayer of this court over 100 years ago. In *Lakin v. Oregon Pacific Railroad Company,* 15 Or 220, 231, 15 P 641 (1887), Justice Thayer wrote:

"[W]here the master obligates himself to transport a person from one place to another safely and properly, and to protect him from injury from any source that human judgment and foresight are capable of providing against, and the master intrusts the performance of the duty he has so undertaken to discharge to his employees, he becomes responsible for their acts, whether negligent or malicious, and they continue in the line of their employment until their relation with the master is absolved. The specified duty of an employee in such a case may be very limited, but the scope of the employment is as broad as the obligations the master has assumed. * * *"

But *Lakin* was a negligence case, not an implied contract case. Plaintiff sued the railroad, claiming she was "badly wounded" and sustained permanent injury in a railroad collision caused by the negligence of the railroad and its servants. The railroad answered, claiming that the person alleged to be an employee and negligent was not in the service or employ of the railroad. This court found that that there was evidence that he was acting in the scope of his employment and that the railroad was liable for the $1,650 verdict whether his act in uncoupling the passenger cars was negligent or intentional. The language of the court does not support plaintiff's contention that a common carrier in this state has an implied contract obligation of safekeeping its passengers.

Plaintiff cites several cases from other jurisdictions which she feels should illustrate a common-law tradition of

holding hospitals strictly liable in contract for the safekeeping of their patients. These cases all involve intentional acts by employees committed while the employees were engaged in the tasks for which they were employed. Thus, in *Vannah v. Hart Private Hospital,* 228 Mass 132, 117 NE 328 (1917), the plaintiff had her ring stolen by a nurse who had been assigned the responsibility of attending plaintiff while she was unconscious. Similarly, in *Stone v. William M. Eisen Co.,* 219 NY 205, 114 NE 44 (1916), the plaintiff was assaulted by an employee who had been assigned to fit the plaintiff with an orthopedic brace.

In *Nazareth v. Herdon Ambulance Service,* 467 S2d 1076 (Fla App 1985), the plaintiff was assaulted by the ambulance attendant who rode with her to the hospital. There the court held the employer liable as a common carrier because the court found that an implied contract existed when a passenger entrusted "his or her bodily safety to the care and control of the carrier's vehicle and employees, and he or she cannot freely or independently walk away, once the undertaking has commenced." *Id.* at 1079. Because there was no question in *Nazareth v. Herdon Ambulance Service* that the employee was also carrying out his duties as an employee at the time of the assault, that court had no reason to dwell on this aspect of the limitations of common carrier liability.

Plaintiff seeks to extend the law beyond any holding of this court. In Oregon, common carriers have a duty to exercise the "highest degree of care and diligence" for a passenger's safety. *Gedney v. Clark,* 201 Or 67, 70, 268 P2d 357 (1954). But, whatever standard of care might be implied by a common carrier accepting a passenger, this court has never held that this standard applies to actions taken by an employee outside the scope of employment nor to convert those acts into a breach of a contract of safekeeping.

In her claim based on an implied contract, plaintiff seeks to make hospitals as a matter of law responsible for their patients' safety in protecting the patients against criminal acts of employees committed on the premises. Plaintiff did not allege any facts which would show that defendant promised to

assume such a responsibility.[2] In the absence of specific allegations of facts showing a special contract, we cannot take the extreme step of finding that all hospitals implicitly have made a contract absolutely to ensure the safety of their patients.

We recognize that hospitals have taken on special responsibilities by admitting and providing care for those who may not be able to take full care of themselves. We do not, however, believe that such an act of admission makes the hospital absolutely responsible for a patient's safety.

The argument that plaintiff seeks to make in her "contract" claim is best addressed to the legislature. In this regard we note that the legislature has already addressed questions similar to those raised by plaintiff. While we were not asked to address the meaning of the statutes and regulations mentioned here, we note that the legislature has apparently decided that hospitals as a type of health care facility have a less extensive responsibility for patient care than do some other health care facilities.

ORS 441.055(1) gives the Health Division the authority to adopt rules concerning health care facilities. ORS 441.055(2) provides that the "[r]ules describing care given in health care facilities shall include, but not be limited to, standards of patient care or patient safety." Subsection (3) gives the governing body of each facility the responsibility for the operation of the facility, the selection of the staff and the quality of care rendered.

The standards of care provided under the authority of ORS 441.055 do not establish any duties for patient safety. OAR 333-72-015 sets forth the general standards for all hospitals. The regulation concerns proper admission procedures, adequate nursing care, and health standards concerning heating devices and linen. The regulation also specifically provides that patients' rooms shall not be locked, but shall be "easily opened from the corridor without the use of a key." OAR 333-72-015(6).

The regulation of long-term care facilities, governed

---

[2] The record reveals that plaintiff, through her agent, signed a consent form in which the hospital offered only to keep her money and valuables safe, and which disavowed responsibility for other valuables not stored in the hospital safe.

by different statutes, ORS 441.100 to 441.367 and ORS 441.600 to 441.745, sets a higher standard for these facilities. ORS 441.605(7) gives the residents of long-term care facilities the right to be free from mental and physical abuse. ORS 441.640 requires the reporting of abuse, and ORS 441.710 to 441.745 allow the imposition of civil penalties by the state for violations of the rules concerning long-term care facilities. OAR 333-86-030(3)(a)(G) requires that these facilities maintain a "safe environment to protect the patient from injury."

The regulation of long-term care facilities shows that the legislature could, if it chose, impose much greater responsibilities on hospitals. The lack of such legislation and the differences in the regulations suggests that the legislators and the administrators of the Health Division decided not to extend the liability of long-term care facilities to hospitals.

The circuit court properly determined that plaintiff stated a potential claim for negligence on the part of the hospital. The court also correctly determined that plaintiff did not plead sufficient facts to state a claim based either on *respondeat superior* liability for the intentional acts of an employee, or on a theory of contract liability based on an implied promise to ensure the safety of all its patients.

The decisions of the Court of Appeals and the trial court are affirmed.